**In re Troy G. SPEER, Debtor.**

**Troy G. Speer, Plaintiff,**

**v.**

**Educational Credit Management Corporation, Defendant.**

**Bankruptcy No. 00–12032–FM.**
**Adversary No. 00–1139–FM.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

Sept. 6, 2001.

Leslie M. Howe, Austin, TX, for plaintiff.

Lisa C. Fancher, Austin, TX, for defendant.

### MEMORANDUM OPINION

FRANK R. MONROE, Bankruptcy Judge.

The Court held a trial of the above-referenced and numbered adversary proceeding on June 12, 2001. At the conclusion of the proceedings, the Court took the matter under advisement. This Memorandum Opinion is being issued as written Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as it is a determination as to the dischargeability of a particular debt.

As such it is a matter which arises both under title 11 and in a case under title 11. Accordingly, this Court has jurisdiction to enter a final order on all issues under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b)(1), 28 U.S.C. § 151 and the Standing Order of Reference from the United States District Court for the Western District of Texas.

### Findings of Fact

Troy Speer, the debtor herein ("Mr. Speer"), executed four separate federally guaranteed student loans as follows: June 7, 1991—$2,625.00, June 14, 1991—$4,000.00, January 10, 1992—$2,625.00 and January 16, 1992—$3,980.00 for a total of $13,230.00. These loans are currently owned and serviced by Educational Credit Management Corporation ("ECMC"), the Defendant herein. The purpose of the loans was to pay for Mr. Speer's vocational training at Texas Aero Tech in Dallas, Texas. Texas Aero Tech was a trade school which supposedly provided instruction in aircraft mechanics and repair.

Mr. Speer learned of the Texas Aero Tech school through a television advertisement. He borrowed the funds for the tuition through the school, enrolled at Aero Tech, completed the required courses in 1992 and graduated. He then prepared to take one part of a multi-part practical exam required by the Federal Aviation Association in order for employment. Mr. Speer failed this exam. It was necessary for him to wait to take the exam again. During the waiting period, Mr. Speer discovered that only three or four graduates from Aero Tech out of his class of approximately fifty individuals were able to pass the test and secure employment despite promises from the school advertisements and personnel insuring job placement. Mr. Speer never returned to attempt to retake the test. He was bitterly disap-

pointed at the representations that Aero Tech had made and eventually wrote his legislative representative regarding the situation although the situation was apparently never investigated. Mr. Speer was twenty-four years of age at the time.

In October of 1992, Mr. Speer applied for an unemployment deferment on the loans. He had moved to Austin to be closer to his mother and stepfather and sought full time employment. After several odd jobs doing carpentry work in the Austin area, he obtained full time employment with a Wimberley construction company. He then submitted a Request for Forbearance in connection with the loans based on his current income which was insufficient at the time to make any payments on the loans and provide him with sufficient income with which to live. He continued to apply for forbearances in 1994 and 1995 based on his income situation and his inability to pay.

Eventually (four years later and after continued interest accrual), the lender garnished Mr. Speer's wages, resulting in payments of ten percent (10%) of his income to the servicers for the student loans. These garnishments continued from March 8, 1999 through July 12, 2000 when Mr. Speer filed for bankruptcy relief under Chapter 7. The amount garnished was $145.00 per month. The garnishment strapped Mr. Speer financially and he was unable to meet all of his monthly obligations, let alone accrue additional savings for unexpected future expenses. Negative cash flow caused by the garnishment resulted in Mr. Speer filing bankruptcy. It is instructive that the balance due on the loans actually increased during the garnishment as the funds garnished were insufficient to pay even the interest accruing on the loans let alone reduce the principal.

The current amount owing on the student loans as of May 21, 2001 was $24,670.42 with interest continuing to accrue currently at $5.09 per day.[1] Collection costs also are alleged in the approximate amount of $4,600.00.

Mr. Speer is currently thirty-four years of age. Mr. Speer listed his current monthly income and expenses as follows:

Gross Income: $13.50 per hour × 40 hr. week
$540/week × 52 weeks = $28,080 yr

| | |
|---|---|
| $28,080/12 = monthly | $2,340.00 |
| Fed withholding | 257.40 |
| FICA and Medicare | 179.01 |
| 6% retirement contribution | 140.40 |

| | |
|---|---|
| Net Monthly Income: | $1,763.19 |
| Monthly Expenditures: | |
| Rent | 225.00 |
| Propane | 5.00 |
| Phone | 19.00 |
| Home Maintenance | 26.00 |
| Food | 257.00 |
| Clothing | 50.00 |
| Medical & Dental | 75.00 |
| Gas | 126.00 |
| License, Inspection, Oil Change | 9.00 |
| Cable | 48.00 |
| Health Insurance | 245.00 |
| Auto Insurance | 85.33 |

1. Interest accruing on the loans is at a variable rate.

| | |
|---|---|
| Auto Lease Monthly Payment | 179.00 |
| 2000 every 24 months (repayment of | 83.00 |
| downpayment to parents) | |
| | |
| Child Support | 180.00 |
| Daughter's medical | 12.00 |
| Haircut, Personal care | 24.00 |
| Tools and Supplies for job (Required by employer) | 40.00 |
| Miscellaneous | 50.00 |
| Dog Food | 10.00 |
| | |
| | |
| Total Monthly Expense | $1,748.33 |
| | |
| Excess Monthly Income | 14.86 |

No money has been allocated for emergencies or unexpected expenses other than $50.00 in the miscellaneous category.

Mr. Speer's counsel provided the Internal Revenue Service collection expense guidelines for certain items. These guidelines are as follows:

| | |
|---|---|
| Housing and Utilities (for Hays County) | $1,024.00 |
| Food | 257.00 |
| Housekeeping Supplies | 26.00 |
| Apparel & services | 120.00 |
| Personal care products | 24.00 |
| Miscellaneous | 100.00 |
| | |
| Total expenses | $1,551.00 |

Mr. Speer is within the recommended category allowances for all the IRS categories. In fact, Mr. Speer has only allocated $50.00 for apparel and the IRS guidelines allow $120.00 and Mr. Speer pays $225.00 for housing where the IRS allows $1,024.00, a difference of $869.00 which Mr. Speer obviously spends on other necessary and ordinary everyday living expenses as well as his daughter's child support, health insurance and medical costs.

From the testimony of both Mr. Speer and his stepfather, Mr. Jim Reece, it is obvious that Mr. Speer is limited in his abilities to find employment. Mr. Speer basically qualifies for unskilled labor positions. Mr. Speer had previously graduated from high school with a C average overall. After high school, he attempted to study at Sul Ross University where he maintained a 1.13 grade point average, Dallas County Community College where he maintained a 2.3 grade point average and Blinn College where he flunked miserably. He has no other formal training other than what he received from Aero Tech, which hardly qualified as anything resembling training.

Mr. Speer earns $13.50 an hour as a carpenter's assistant/roofer. An affidavit provided by a builder in the Austin area indicates that the most an experienced carpenter can expect to make is $18.50 per hour. The housing market has been booming, but signs of faltering are beginning to surface. Any significant blip in the economy would affect Mr. Speer's income negatively. Mr. Speer works in a job requiring hard physical labor in the hot central Texas sun eight hours a day, forty

hours a week. Mr. Speer has had a previous back injury.

Mr. Speer is divorced and has one dependent, a thirteen year old daughter. He pays child support of $180.00 per month which support payment was established in 1989. Mr. Speer has never missed a payment. He is also required to carry medical insurance and pay one/half of the medical bills with respect to his daughter. Mr. Speer has not seen his child in three years. Should his ex-wife pursue a support modification, it is likely that his child support, based on his current income would increase to $320.00 per month. In any event, he will continue to pay at least $180.00 per month plus health insurance and his share of the medical bills for the next five years.

Mr. Speer lives in a twenty-seven foot by eight foot travel trailer owned by his mother. He pays $225.00 per month to rent the lot upon which it sits, including utilities. Mr. Speer indicates he sometimes builds closets larger than his travel trailer. He is in need of additional dental work, but he does not have the funds to pay for such at this time. His mother who is 69 years of age and his stepfather who is 70 years of age subsidize a substantial amount of his living expenses and have over the last several years. They lease the vehicle he drives and then Mr. Speer repays them as he does not have sufficient savings to make a down payment. His parents cover emergency doctor bills, prescriptions and anything else out of the ordinary that Mr. Speer cannot cover with his current income situation. Recently, they helped him replace his refrigerator in the travel trailer. They paid for his attorney fees to file bankruptcy. It is obvious that if Mr. Speer's mother and stepfather were not subsidizing Mr. Speer's income, Mr. Speer's situation would be much worse. How much longer they will live

and/or be able to subsidize Mr. Speer is uncertain.

Mr. Speer does not have much of a social life. He has cable TV (a luxury according to ECMC) and a dog. He has experienced bouts of depression due to his financial situation and according to his stepfather has even contemplated ending his life. It is obvious Mr. Speer lives in a fragile emotional state. Mr. Reece, Mr. Speer's stepfather, summed up Mr. Speer's life best:

Mr. Speer has no social life. He is in constant turmoil over how to pay for unexpected expenses. He has had back surgery. His living quarters are substandard. He has not seen his child in over 3 years. He needs several teeth pulled. He has very few clothes. He is in a constant state of financial purgatory and sees no way out. His only outlets for entertainment are his cable television and his dog.

ECMC evidently offers several different types of repayment options with respect to the student loans. One is a twenty year repayment with the monthly payment being $210.25 for total payments of principal and interest of $50,460.00 assuming all payments are made timely. Another option is the graduated repayment plan where the loans are also paid off over twenty years but monthly payments are increased gradually every two years. Payments for Mr. Speer would begin at $169.64 per month and increase over time to $297.70 per month for total payment of principal and interest of $54,808.35 again assuming all payments are made timely. This is in connection with an original debt of $13,000.00. ECMC argues that Mr. Speer, by adjusting his expenses, has sufficient income to currently fund the loan. ECMC further urges that even if Mr. Speer's current income is insufficient, that his situation is not likely to persist for a significant period of time. ECMC insists

that Mr. Speer is capable of additional employment to supplement his income. Further, ECMC points out that Mr. Speer's situation will improve when his daughter reaches eighteen years of age and his support obligations terminate.

### Legal Issues

Whether Mr. Speer's student loans are dischargeable under the undue hardship exception of Section 523(a)(8) of the Bankruptcy Code?

### Conclusions of Law

#### Introduction

Section 523(a)(8) of the Bankruptcy Code provides:

> "(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
>> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents."

11 U.S.C. § 523(a)(8).

1. *What could Congress possibly be thinking?, or Why does the government hate the little man?*

 In enacting § 523(a)(8) of the Bankruptcy, Congress was primarily concerned about abusive student debtors and protecting the solvency of student loan programs. Congress was specifically concerned with reports of recent graduates (especially doctors and lawyers) declaring bankruptcy as a way to avoid repayment of student loans on the eve of lucrative careers. Unfortunately, Congress did not specifically address this abuse when crafting the undue hardship exception, but rather, it decided that all students borrowing money were potential bums and could not be trusted. As an additional irritation, the statute Congress crafted gives the Courts absolutely no guidance as to what would constitute "undue hardship" other than a Webster's dictionary.

 Basically, the application of this standard requires each court to apply its own intuitive sense of what "undue hardship" means on a case by case basis. With so many Solomons hearing the cases, it is no wonder the results have varied. Many courts have emphasized the importance of repayment of these student loans regardless of whether debtors can actually repay the student loan obligations over time. *New York State Higher Educ. Servs. Corp. v. Kohn (In re Kohn),* 5 Bankr.Ct.Dec. (CRR) 419 (Bankr.S.D.N.Y.1979); *Pendergrast v. Student Loan Servicing Ctr. (In re Pendergrast),* 90 B.R. 92 (Bankr. M.D.Pa.1988); *Courtney v. Gainer Bank (In re Courtney),* 79 B.R. 1004 (Bankr. N.D.Ind.1987). These courts view "undue hardship" as meaning that a debtor must demonstrate "unique and extraordinary circumstances" or a "certainty of hopelessness." *Id., but see also, In re Roberson,* 999 F.2d 1132 (7th Cir.1993); *Panteli v. New York State Higher Educ. Servs. Corp.,* 41 B.R. 856 (Bankr.S.D.N.Y.1984); *Shoberg v. Minnesota Higher Educ. Coordinating Council,* 41 B.R. 684 (Bankr. D.Minn.1984). This Court has difficulty with such a strict interpretation for the honest, but financially strapped debtor with student loans. This is especially so in light of the fact that the predominant goal of the Bankruptcy Code is to provide such honest and financially strapped debtors a fresh start from burdensome debt. The

difficulty in reconciling the undue hardship exception with the overriding policy goals of bankruptcy has finally compelled this Court to express in writing its continuing frustrations with student loan dischargeability issues in general.

The guaranteed student loan program offers loans without regard to the borrower's credit worthiness. As such, student loans are a great benefit to those who would not ordinarily qualify for a loan otherwise. The student loan represents an investment in the borrower's future ability to generate income. Consequently, there is an expected likelihood of changed circumstances based on educational training—that is the borrower will obtain employment with income sufficient to repay his student loan obligations

However, this is not always the case. Oftentimes, through no fault of the borrower, he is unable to generate the expected income. In obvious cases this has occurred when the borrower has developed a mental or physical incapacity, is unable to obtain employment in his field of education or is unable to complete his education. This leaves some borrowers with the same low earning capability which they had when they began their education, a capacity which allows them only to survive with no income for the things most Americans enjoy, much less income to pay the educational loan. Other borrowers are unable to maintain sufficient income to care for their dependents and make repayments. Still, other borrowers obtain their degrees only to learn that the jobs available in their fields of study will not produce sufficient income to enable them to repay the student loans.

And, sometimes, as is the case here, the school fails to educate the borrower properly, if at all. This leaves the borrower with no benefit from his "education", no ability to repay, and an obligation to repay

unless he can prove "undue hardship". The debtor has all the burdens under § 523(a)(8), although the creditor has the burden of proof under virtually every other section of § 523, including fraud under § 523(a)(2)(A). And, in this case, which is not out of the ordinary at all, the government gave Aero Tech the control over the loaning of funds to the students who applied. In a complete and total abdication of any scintilla of responsibility, our government gave Aero–Tech the right to loan our money to anyone who applied to Aero–Tech without regard to Aero–Tech's competency or honesty and without regard to whether there were actually jobs in the marketplace for its graduates, even assuming the graduates would be properly trained, which they were not. And now, in consideration of this total abdication of responsibility by our Congress in the educational loan guaranty programs as run by the bureaucrats in Washington, our government gets a pass and the debtor bears all the risks and all the burdens—although no one took the time to explain this to Mr. Speer before he borrowed the money. This situation is akin to the farmer (U.S.government) putting the fox (Aero–Tech) in charge of the hen house (students) and not only blaming the students if they get eaten, but also charging them for the cost of the meal.

Also frustrating is the fact that in most student loan cases before this Court, the debtor has requested either a forbearance or a deferment, and in most cases either both, and sometimes several forebearances or deferments have been granted prior to ever filing bankruptcy. This is often due to the fact that the borrower's income, for whatever reason, is actually insufficient at that time to allow the borrower to maintain necessary living expenses and repay the student loans. Lenders actually approve these forbearance/deferment re-

quests not once or twice but several times. It is oftentimes not until these debtors file bankruptcy and attempt to discharge the student loans that the lenders finally attempt collection efforts through non-dischargeability proceedings. This is at a time when most debtors owe more interest on their notes than principal. Here, the lender rarely agrees to any type of settlement even when it is obvious the debtor cannot repay the total debt with interest in most cases within the debtor's lifetime. The most often heard excuse is that there's no one at the agency with authority to "make a deal".[2]

■ This Court believes that it is time to reconcile the "undue hardship" standard with the underlying fresh start policy of the Bankruptcy Code. "Undue hardship" should not be interpreted so harshly as to leave debtors personally liable for student loans they have no *real* ability to repay for the rest of their lives. To the contrary, to provide such debtors the fresh start they deserve, undue hardship should be found to exist for any debtor who, although doing his best under the circumstances, will not be able to maintain the basic necessities of life (shelter, food, medical care, clothing, etc.) and at the same time repay student loan debt. Under that test, it is clear Mr. Speer has proven undue hardship.

In addition, the Court will also make the traditional *Brunner* analysis of undue hardship since the parties think that is the standard the Court should apply.

2. *Let's make it as tough as humanly possible to discharge a student loan or the Brunner test.*

■ As discussed above, the Bankruptcy Code does not define "undue hardship".

As such, courts have taken different approaches in actions to determine dischargeability of student loans. The Fifth Circuit has not yet ruled on "undue hardship".[3] However, it appears the trend is toward the adoption of the standard set forth by the Second Circuit in *Brunner v. New York State Higher Educ. Serv. Corp.,* 831 F.2d 395, 396 (2d Cir.1987). According to *Brunner:*

"[U]ndue hardship" requires a three-part showing: (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and for her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

831 F.2d at 396.

The first prong of the *Brunner* test requires an examination of the debtor's current income and expenses to determine if repayment of the loan would cause the debtor to fall below a minimal standard of living for the debtor and any dependents. This prong must be met before the Court can examine the next two prongs. Under this prong, the debtor must demonstrate that he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt.

The second prong requires that the debtor show that his strained financial condition, demonstrated by the application of the first prong, will continue for a significant portion of the repayment period. Therefore, the court must determine here whether circumstances strongly suggest

---

2. One is often reminded of "One Flew Over the Cuckoo's Nest" starring Jack Nicholson when dealing with § 523(a)(8) cases.

3. But something tells me they soon will.

the debtor will be unable to repay over an extended period of time. *Brunner* at 396.

Last, the debtor must satisfy the third and final prong of the test—the debtor must show that he made a good faith effort to repay the loan. The Court should consider whether the debtor has made an effort to maximize his income and minimize his expenses. Therefore, a debtor may not willfully or negligently cause his own default. *Roberson*, 999 F.2d at 1136.

Applying the *Brunner* test, this Court must decide whether Mr. Speer's circumstances justify discharging his educational loans. Mr. Speer has the burden of proving that such dischargeability is justified.

### 1. Can Mr. Speer maintain, based on current income and expenses, a minimal standard of living for himself?

Determining whether Mr. Speer's income and expenses would allow him to maintain a minimal standard of living if required to repay the student loans is within the Court's discretion. *United Student Aid Funds, Inc. v. Pena*, 155 F.3d 1108 at 1112 (9th Cir.1998).

Mr. Speer's gross income is $2,340.00 per month. This figure is subject to deductions for federal tax ($257.40), social security ($179.01) and retirement ($140.00). Mr. Speer's take home pay is then $1,763.19. Mr. Speer's expenses as reflected on his budget total $1,748.33. His scheduled income less expenses leaves him with disposable income of $14.86 per month.

ECMC first questions the contribution for retirement of $140.00 per month as unnecessary. Mr. Speer has no employer provided retirement and has only recently begun to make the $140.00 per month retirement contribution to attempt to establish and build some type of retirement for himself. For the purpose of analysis the $140.00 retirement deduction will be added back into Mr. Speer's income as it appears clear that Congress intended this statute to be applied against debtors in as punitive a manner as possible. Paying the government back would certainly take priority over saving for retirement under a standard of "undue hardship". This makes Mr. Speer's take home pay $1,903.38 per month.

Next we examine Mr. Speer's monthly expenses. The Court does not take issue with any of these expenses. In fact, the food expense is clearly understated. Mr. Speer testified that he spends $450.00 per month for food and that is the number he initially put on Schedule J, but when the IRS guidelines were reviewed by his legal counsel which allow for only $257.00 per month for a individual for food, his counsel amended his budget to reflect the lower amount to be in line with the guidelines. The $450.00 per month for food for Mr. Speer is $15.00 per day. He is employed in a physically demanding job that likely requires a high food intake for Mr. Speer to do his job. Further, Austin and its surrounding community is one of the most expensive places in the state in which to live. Allowing the actual expenditure of $450.00 for food would increase Mr. Speer's expenses by $193.00 per month making his total expenses $1,941.33.

Further, Mr. Speer's rent and utilities, although accurate, are extremely low due to the fact he currently lives in the travel trailer owned by his mother. If his mother did not own the travel trailer, Mr. Speer's rent and utilities would certainly exceed $257.00 per month even if Mr. Speer obtained a roommate. Therefore, any increase in rent and utilities (which is likely to happen in the future) would further exacerbate Mr. Speer's already negative cash flow position. IRS guidelines allow Mr. Speer $1,024.00 per month. If

Mr. Speer were not living as he is and was required to live in a rental apartment, his monthly expenses would increase by at least $400.00 to $500.00 per month. This will certainly happen as Mr. Speer testified that the travel trailer will at some point in time in the foreseeable future become un-inhabitable.

ECMC takes issue with Mr. Speer's cable bill of $48.00 per month—his only outlet for entertainment besides his dog. Since Mr. Speer has no other entertainment costs other than his dog, the Court does not believe that this is a luxury item to Mr. Speer. In fact, it may be his only outlet for sanity. And, even if it were a luxury item, adding it back into his income would not make his disposable income any more meaningful at this point.

Based on the foregoing, Mr. Speer does not have sufficient income to repay based on the flat monthly loan repayments for twenty years at $210.25. Neither can he make the $169.64 monthly payment based on the graduated payment plan as proposed by ECMC without endangering his ability to maintain his current admittedly minimal standard of living.

Further, Mr. Speer's budget is conservative and does not contain any projected expenses for unexpected emergencies which seem to arise on a monthly basis. For example, there is no provision for medical costs over and above his payment for health insurance and no expense projection for car repair or other miscellaneous necessities or unforeseen costs. It is doubtful that the $50.00 in the miscellaneous category would be sufficient to cover such expenses. And, Mr. Speer has continually requested and obtained the assistance of his mother and stepfather over the past ten years.

In addition, we know that when Mr. Speer's wages were garnished at $145.00 per month, it pushed him over the edge financially. He was incapable of meeting all of his necessary living expenses. He had to request additional financial assistance from his mother and stepfather. He recently had to purchase a new refrigerator and had to obtain the funds from his mother. And, it was his already negative cash flow position further exacerbated by the garnishment that caused Mr. Speer to file for bankruptcy relief, his attorney's fees being once again paid by his mother and stepfather. And, even so, the garnishment amount of $145.00 per month was insufficient to cover even the monthly interest accruing on the loans at that time.

Any little unexpected expense thrown into Mr. Speer's already conservative budget will upset his apple cart and his world. It is quite obvious to this Court that Mr. Speer cannot actually maintain (even if it might appear to some that he could) a minimal standard of living and attempt to repay his student loans. Mr. Speer has satisfied the first prong of the *Brunner* test.

## 2. Is Mr. Speer's financial condition only temporary or will it continue over a substantial part of the repayment period?

ECMC believes that Mr. Speer is capable of other employment that would be more lucrative or that he could supplement his present income with other part-time work. However, as is always the case, the educational loan creditor presented *no* evidence of this—it simply and boldly made the unsubstantiated assertion.

There is no doubt that in five years when his daughter reaches age eighteen that Mr. Speer's income will increase by at least $192.00. We do not know, however, what Mr. Speer's specific situation will be when that happens. We do know that Mr. Speer has for the past ten years (after the

failure of the "education" Mr. Speer purchased at Aero–Tech) simply maintained a "bare-essentials" existence. There is no indication at all that this will change—or that Mr. Speer could reasonably do anything to change his circumstances for the better. Further, there is no guarantee that Mr. Speer's mother and stepfather will still have the ability to assist him in five years—they may have their own financial obligations to consider. And, needless to say, Mr. Speer's parents will not be here forever.

It is not likely that Mr. Speer is capable of more lucrative employment. He has a work history of only unskilled labor. He has not completed any vocational or technical training other than the Aero Tech school which obviously provided him with no benefit, and it is very doubtful he could obtain any benefit from such training now ten years later. It is also obvious from Mr. Reece's testimony that Mr. Speer lacks the capacity to obtain any higher education. At most, at his skill level, Mr. Speer's current employer might raise his pay to $15.00 an hour, the maximum his employer pays, at some unspecified point in the future. This would allow Mr. Speer an additional $100.00 per month in income. Wow! He would be in tall cotton then. Currently, the housing market is still strong, although not as strong as a year or two ago, and we are beginning to see a slow down in the economy. The likelihood of future salary increases for Mr. Speer in excess of that needed to meet inflation is speculative. It does not suggest that Mr. Speer's disposable income will significantly improve over time to a point where he could pay ECMC and maintain a minimal standard of living.

ECMC also suggests that Mr. Speer could obtain additional employment to supplement his income. Mr. Speer is a carpenter's helper/roofer. He works eight hour days building homes which requires hard physical labor very taxing on the body. It is not likely Mr. Speer has the ability after an eight hour day in 90 degree plus heat to take on an additional job to attempt to increase his income. And, this Court is also unsure as to whether such is a requirement under the *Brunner* test. The court believes it is unreasonable to require Mr. Speer to seek part-time employment, in addition to his current full time job, even though he may one day be forced to do this just to make ends meet.

Theoretically, there could be additional available income in five years (no more support payments coupled with an assumption that Mr. Speer makes $15.00 per hour), but only if all other expenses stayed exactly the same and Mr. Speer continued to live in a travel trailer for the rest of his life and his parents continued to subsidize him. But, in five years, the balance on the loan will have grown to an estimated $40,154.00 which would require a monthly payment of $382.98 to pay off principal and interest over a twenty year period. Mr. Speer still could not make such a payment.

Finally, Mr. Speer has been with the same employer for at least the last five or six years. His financial difficulties have persisted as far as this Court can tell over those past years. During this time period, Mr. Speer requested several deferments and a forbearance on his student loans because he could not afford to live and make the repayments on his student loans. His mother and stepfather have repeatedly helped him obtain vehicles and now lease a vehicle for him. Mr. Speer then repays them the down payment on a monthly basis as well as handles the monthly payment and insurance. For medical problems or unexpected repairs or purchases, he must request assistance from his mother and stepfather and does so on a frequent basis. This relationship with his

mother and stepfather has continued for the last several years when Mr. Speer has obviously been unable to maintain all of his financial obligations on his own. This financial struggle has occurred without any ability to make a student loan payment. These past circumstances speak volumes to the fact that Mr. Speer's financial difficulties are not temporary, but likely to continue as they have over the past several years.

Further, Mr. Speer has already experienced the effects of a student loan garnishment which drove him into bankruptcy.[4] He has experienced the increase in the amount of these loans overtime while repaying under the garnishment instead of a decrease in such amount. If this debt were not discharged, he could not pay it. ECMC would then garnish his pay once again and, once again, the garnished payments would not be sufficient to pay down the interest accrual on the debt. So, Mr. Speer would be consigned to a life of continually paying ten percent (10%) of his income to ECMC until the day he died, at which time he would owe a great deal more than he does now. If that is not an indication of "undue hardship", what is?

Mr. Speer's circumstances are likely to persist indefinitely. The second prong of the *Brunner* test is satisfied.

### 3. Has Mr. Speer made a good faith effort to repay the loans?

ECMC argues that Mr. Speer does not meet the final *Brunner* requirement of good faith since he did not make any voluntary payments on the student loan obligations and because he has not exhausted his possibilities for increasing his income or decreasing his expenses.

Under *Brunner,* in order to show good faith, a debtor must make an effort to repay the loans or show "that the forces preventing repayment are truly beyond his or her reasonable control". *Brunner* 46 B.R. 752 at 755 (S.D.N.Y., 1985) (*aff'd,* 831 F.2d 395, (2d Cir.1987)). Mere failure to make a minimal payment does not prevent a finding of good faith where a debtor has never had the resources to make a payment. *In re Brown,* 239 B.R. 204, 209 (S.D.Cal.1999).

Mr. Speer has demonstrated his good faith even though he did not make a voluntary payment on the student loans. First, Mr. Speer has obtained and maintained his employment and has never sought to manipulate his income or expenses to avoid paying his loans. In fact, by finally obtaining full-time employment Mr. Speer has maximized his income given his existing circumstances. His expenses are extremely conservative. He pays all his other debts, albeit with the help of his parents. He has no credit card debt. The Court does not see how it would be possible to reduce these expenses further and still maintain a minimal standard of living.

Mr. Speer's failure to make a single payment on student loan obligations does not preclude a finding of good faith because he has not possessed the requisite resources to make such payments. *Lebovits v. Chase Manhattan Bank,* (In re Lebovitz), 223 B.R. 265, 274 (Bankr. E.D.N.Y.1998); *In re Clevenger,* 212 B.R. 139, 146 (Bankr.W.D.Mo.1997).

Mr. Speer requested several deferments and a forbearance. With those requests, he indicated to the student loan creditor that he was struggling to make ends meet and could not afford repayment at that time. He also acknowledged at that time to the student loan lender his frustrations

---

**4.** Mr. Speer basically filed due to the student loan garnishment. His only other creditors were medical debt and divorce attorney fees. He had no credit card debt.

with Texas Aero Tech and its inability to properly educate him. Mr. Speer is still struggling with his financial situation ten years later and cannot afford repayment of the student loans. The forces preventing repayment here are truly outside of Mr. Speer's reasonable control and the explanations for his predicament are credible. He is not responsible for his financial hardship here. He has done everything possible to maximize his income and minimize his expenses. Mr. Speer has met the third prong of the *Brunner* test. As such, all elements of the *Brunner* test have been satisfied supporting discharge of Mr. Speer's student loan obligations under § 523(a)(8).

### Conclusion

Excepting Mr. Speer's debt to ECMC from discharge will impose an undue hardship on Mr. Speer within the meaning of 11 U.S.C. § 523(a)(8). The Court therefore finds, based on the foregoing reasons, that Mr. Speer is entitled to discharge his student loans.