In re Jonathon R. GERHARDT,
Debtor.

Jonathon R. Gerhardt, Plaintiff,

v.

Southwest Student Services Corp., Enterprise Recovery Systems, Inc., U.S. Department of Education, and University Accounting Services, Inc., Defendants.

Bankruptcy No. 99–10477.
Adversary No. 99–1061.

United States Bankruptcy Court,
E.D. Louisiana.

April 9, 2002.

M. Elizabeth Bowman, New Orleans, LA, for debtor.

### MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

This matter came on for trial on December 3, 2001 on the complaint of Jonathon R. Gerhardt to have student loans discharged under 11 U.S.C. § 523(a)(8). Gerhardt had made these loans with the U.S. Department of Education ("DOE"), the Educational Credit Management Corporation ("ECMC"), and University Accounting Services, Inc. The court finds that Gerhardt has met his burden of proving undue hardship under Section 523(a)(8), and therefore, the student loans are discharged.

### I.  *Findings of Fact*

#### A.  *Gerhardt's student loans*

1.  The DOE is the holder of six promissory notes executed by Gerhardt, as follows:

a. promissory note executed on October 6, 1983 for $10,733.80,

b. promissory note executed on July 9, 1986 for $5,000,

c. promissory note executed on August 19, 1986 for $3,000,

d. promissory note executed on March 25, 1987 for $1,200,

e. promissory note executed on June 9, 1987 for $7,500,

f. promissory note executed on August 4, 1987 for $4,000.[1]

2. ECMC is the holder of two promissory notes executed by Gerhardt, as follows:

a. promissory note executed on December 16, 1988 for $2,000,

b. promissory note executed on January 29, 1996 for $13,213.15.[2]

3. Gerhardt is in default on all of these notes.

4. Evidence was also introduced as to loans Gerhardt made with University Accounting Services, Inc. while he was enrolled at the New England Conservatory of Music. He had one Perkins loan of $1,500 for the 1986–87 school year, one Perkins loan of $1,500 for the 1987–88 school year, and one Perkins loan of $4,250 for the 1988–1989 school year. A default judgment was entered in favor of the debtor as to these loans on January 3, 2002.[3]

5. Gerhardt testified that as of the time of the trial, the amount due in principal and interest on his student loans was:

| | |
|---|---|
| DOE | $77,448.45 |
| ECMC | 19,895.23 |
| | $97,343.68 [4] |

---

**1.** Pretrial order at 2–3.

**2.** Pretrial Order at 3.

**3.** Pl. 50.

### B. *Gerhardt's background*

·6. Gerhardt is 43 years old. He is single, has never been married, and has no dependents.

7. In 1980, he graduated from the Eastman School of Music with a bachelor's degree in music. He was employed in Ohio as a musician with the Columbus Symphony from 1983 to 1986. For the years from 1983 to 1986, his parents helped support him.

8. He attended the New England Conservatory of Music from 1986 to 1989, and received his master's degree in music in 1989.

9. After 1989, he worked as a cellist with the Boston Symphony, the Honolulu Symphony, and then returned to the Columbus Symphony.

### C. *Employment with the Louisiana Philharmonic Orchestra*

10. Gerhardt came to New Orleans in 1994, and joined the Louisiana Philharmonic Orchestra ("LPO"), where he is currently employed as a cellist. He has been a principal cellist since January 2000. As a principal cellist, he gets an additional $4.00 per week more than a regular cellist.

11. The LPO is the only professional orchestra in New Orleans. The season runs from September through May.

12. Gerhardt has four rehearsals and two concerts per week with the LPO. These are each usually 2½ hours. Because the LPO is a co-op, and owned by the employees, he has certain additional responsibilities, such as administrative re-

---

**4.** *See* Gerhardt Ex. 3. Gerhardt also testified that $12,254.89 was owed to University Accounting Services. A default judgment was entered against this defendant on January 3, 2002. *See* Finding of Fact # 4.

sponsibilities, performing at free gigs, and community work.

13. Gerhardt has to practice his cello three hours per day.

### D. *Gerhardt's employment / income*

14. Gerhardt's income for the last few years is as follows:

| Date | Gross Income | Adjusted Gross Income | Taxable Income |
|------|------|------|------|
| 1996 | $19,255 | $19,582 | $10,332 |
| 1997 | $19,388 | $19,883 | $ 8,757 |
| 1998 | $21,405 | $23,742 | $14,278 |
| 1999 | $23,704 | $20,443 | $13,393 |
| 2000 | $26,749 | $21,809 | $14,609 [5] |

15. Gerhardt's current annual salary with the LPO is $18,200.

16. He receives unemployment compensation between seasons at the LPO. From June to September 1, 2000, he received $258 per week, for a total gross figure of $3,096.

17. Gerhardt's monthly adjusted gross income after taxes through November 1, 2001 was $1,680.47.[6]

18. Since coming to the LPO, Gerhardt has auditioned for about four or five other symphony orchestras that pay a higher salary for cellists than that in New Orleans, including Naples, Ft. Lauderdale, St. Louis, and Atlanta. At the time of the trial, he testified that he intended to audition with the Kansas City Symphony in February 2002. He testified that these auditions cost approximately $200–$250 each, but the only way to be hired by another symphony is to audition for a position. He testified that the auditions are very competitive. For example, over 200 people applied for a recent job opening in Houston.

19. Gerhardt is also a cello instructor at Tulane University. His income there depends on how many students sign up for his class. If enough students sign up, he teaches in the fall and spring, and makes $25 per hour. His gross income from Tulane for 2001 as of November 1, 2001 was $725.[7]

20. Gerhardt testified that he has inquired about the possibility of teaching positions at other colleges in the area. The only other college in the area that has cello students, however, is Loyola University, which has a full time staff position. This position has been filled for a number of years by the same person, a friend of Gerhardt. There are no current openings at Loyola.

21. Gerhardt also works at private events through agencies operated by Patti Adams and Rachel Van Voorhies. His 2001 gross income from Rachel Van Voorhies as of November 1, 2001, was $1,000, while he received $1,222.80 from Patti Adams for that time period.[8]

22. Gerhardt has no skills or training other than as a cellist.

### E. *Gerhardt's expenses*

23. Gerhardt's estimated monthly living expenses are $1,829.39.[9]

24. Gerhardt testified that he lives in a one bedroom, 600 sq. ft. apartment. He drives a 1994 Saturn.

25. He has no retirement plan, no savings, no certificates of deposit, and no stocks, bonds, etc. He does not own any

---

**5.** Pretrial Order at 3–4. The figures for 1997 were taken from Gerhardt's 1997 tax returns because the figures on the pretrial order did not match the figures on the tax returns.

**6.** Gerhardt. Ex. 8. *See also* Gerhardt Ex. 1.

**7.** Gerhardt Ex. 8.

**8.** Gerhardt Ex. 8.

**9.** Gerhardt Ex. 8. *See also* Gerhardt Ex. 7.

real estate. He has never owned any significant assets of any kind.

26. Gerhardt does not have a cell phone, pager or beeper. Gerhardt testified that he did not take a vacation this year, and cannot remember when he took a vacation. He visited his mother in Columbus, Ohio, a year ago in September. He lives a frugal lifestyle, and has lived frugally his entire life.

27. He belongs to a fitness center for which he pays $48.51 per month.[10] He testified that although this is partly for his personal benefit, it also helps him in his job in that he had been getting pains in his arm and back, which are alleviated by the workouts.

28. Gerhardt has no credit card debt, and has no other outstanding loans. Indeed, student loans are the only loans he has incurred.

29. Gerhardt testified that the cello he plays is expensive. He stated that his mother owns the cello, but he has use of it and treats it as if it is his own.

30. Gerhardt testified that as of the date of the trial, the amount due in principal and interest on his student loans is $77,448.45 to the Department of Education, and $19,895.23 to the ECC.

31. Gerhardt has been employed as a musician his entire adult life, and has no training or skills for any other type of employment.

32. He testified that he has no expenses that he can reasonably eliminate or cut back on and still maintain a minimal standard of living.

F. *Testimony of Ann Cohen*

33. Ann Cohen, a cellist with and President of the LPO, testified as to the future of the New Orleans Symphony. She stated that the annual salary of the musicians is determined by the budget, which is based primarily on ticket sales and individual and corporate donations. She testified that for the 2001–2002 season, the musicians had a reduction in salary, and that it was not likely that the salary would increase next year and might even be cut again.

34. She stated that the cello is physically challenging to play. The average age of musicians at the LPO is 30 to 35 years old.

35. There are expenses in maintaining a cello. The strings on a cello need to be replaced twice a year. The bows should be rehaired every two months, which is expensive because the bows must be sent to New York.

36. Ms. Cohen testified as to the national trend of music schools accepting and graduating increasing numbers of students with majors in music, at the same time that more orchestras continue to eliminate positions and ultimately close.

37. Ms. Cohen testified as to the intense competition to join any orchestra, and particularly, the few orchestras around the country that pay the larger salaries. She testified that there are few openings, and the few are filled by younger people because they can practice more for the auditions. She stated that in her opinion, although it was not impossible, it was highly unlikely that at his age Gerhardt would be accepted at one of the symphonies that pay substantially better than the New Orleans symphony.

38. The court finds the testimony of Ms. Cohen credible.

G. *Gerhardt's payment on student loans*

39. Gerhardt made some payments on the loans held by ECMC and University

---

10. Gerhardt Ex. 8.

Accounting Services. Gerhardt made fewer payments on the loans held by the DOE, but did make some payments.

40. Gerhardt testified that he contacted the DOE before filing for bankruptcy to work out a payment plan on the debts, and was informed that his monthly payment would be approximately $1,000, and that a lower amount would not be accepted.[11] He could not pay $1,000 per month in student loans, and so filed for bankruptcy protection.

41. Gerhardt received three forbearances during the repayment of the loans, immediately after college in 1980, in 1983 before becoming employed with the Columbus Symphony, and in 1989, immediately after graduating from the master's program. These forbearances were sought to enable him to become employed. When he became employed, he made some payments on the loans.

### H. *Summary*

42. The court finds Gerhardt to be an honest and credible witness.

43. The court finds that Gerhardt's financial position will not improve unless he is hired by an orchestra in another city at a higher salary. It will be difficult for Gerhardt to get a higher paying job with a different symphony orchestra at all because of the intense competition, particularly from younger players. Further, even if he were to get a higher paying job, it would likely be in a city where the living expenses are also higher, such that any pay raise would likely be negated by higher expenses.

44. Gerhardt has tried to increase his income in his profession. He has sought out higher paying employment within his field of playing the cello, and takes on whatever part time work in the field he is able to get. He has not attempted to seek employment in another field because he has no other training or skills. The court finds that if he were to take on a part time job in another field, he might well lose the job he has because he would not be able to practice his cello enough. If he does not practice the cello, he will certainly be unable to get a higher paying job with a different symphony orchestra, and might lose the job he presently has with the LPO.

45. The court further finds that Gerhardt has kept his expenses at a very low level. It would be unrealistic to expect that they could be lowered, and still provide a minimal standard of living. The court concludes that Gerhardt currently has a minimal standard of living.

### I. *Procedural background*

46. Gerhardt filed his bankruptcy petition under Chapter 7 on January 29, 1999.

47. Gerhardt filed the pending complaint to determine dischargeability of student loans on March 25, 1999.

### II. *Conclusions of Law*

### A. *Burden of proof under Section 523(a)(8)*

Section 523(a)(8) of the Bankruptcy Code exempts from discharge a debt:

> for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on

---

11. *See also* Gerhardt Ex. 3, letter of August 13, 1998 from US. Department of Education.

the debtor and the debtor's dependents.[12]

The general rule under Section 523(a)(8) is that educational loans are not dischargeable in bankruptcy. An exception to the non-dischargeability rule exists, however, if the debtor shows that excepting educational loans from discharge "will impose an undue hardship on the debtor and the debtor's dependents."

■ "Undue hardship" is not defined in the Code, but is a term of art that the court interprets in its discretion.[13] Although the Fifth Circuit has not yet delineated the test to be applied in determining undue hardship, most appellate circuits and lower courts within the Fifth Circuit have adopted the three part test set forth by the Second Circuit in *Brunner v. New York State Higher Education Services Corp.*[14] Accordingly, the court will apply the *Brunner* analysis to the pending case.

■ The *Brunner* test requires a showing:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.[15]

### B. *Minimal standard of living*

■ Under the first prong of *Brunner*, the debtor must prove that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living if forced to repay the loans. To meet this requirement, the debtor must demonstrate more than simply tight finances.[16] On the other hand, "[u]ndue hardship does not require poverty or hopelessness."[17] When a family earns a modest income and the family budget, which shows no unnecessary or frivolous expenditures, is still unbalanced, a hardship exists that permits discharge of the debtor's student loan obligations.[18]

■ It is clear that Gerhardt's expenses, reduced to the lowest amount possible, exceed his income. Gerhardt cannot maintain a minimal standard of living if he is ordered to repay the full amount of his student loans. The evidence showed that the debtor's present monthly expenses are $1,829.39, while his monthly income as of the date of trial was $1,680.47.

The defendants argue that Gerhardt's expenses include charges that can be eliminated, such as a $37.26 monthly expense

---

**12.** 11 U.S.C. § 523(a)(8).

**13.** *In re Koch*, 144 B.R. 959, 963 (Bankr. W.D.Pa.1992).

**14.** 831 F.2d 395, 396 (2nd Cir.1987). *See, e.g., In re Roberson*, 999 F.2d 1132, 1135 (7th Cir.1993); *In re Cheesman*, 25 F.3d 356, 359–60 (6th Cir.1994), *cert denied*, 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995); *In re Nary*, 253 B.R. 752, 761 (N.D.Tex.2000); *In re McLeroy*, 250 B.R. 872, 878 (N.D.Tex.2000); *In re Kettler*, 256 B.R. 719, 722 (Bankr. S.D.Tex.2000).

**15.** *Brunner*, 831 F.2d at 396.

**16.** *In re Faish*, 72 F.3d 298, 306 (3rd Cir. 1995), *cert. denied, Faish v. Pennsylvania Higher Educ. Assistance Agency*, 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996).

**17.** *In re Gotay*, 258 B.R. 531, 533 (Bankr. D.Mass.2001), *citing, In re Kopf*, 245 B.R. 731, 744–45 (Bankr.D.Me.2000); *In re Hoyle*, 199 B.R. 518, 523 (Bankr.E.D.Pa.1996).

**18.** *In re Hoyle*, 199 B.R. at 523.

for cable television, a $23.90 internet service provider, a $48.51 health club expense, and a $20.83 expense for his cat. They further contend that a $50 telephone expense and a $250 car maintenance and repair expense are too high.

The court disagrees with the defendants' arguments. It is true that some courts, including the case of *In re Dillon*,[19] cited by the defendants, have declined to discharge student loan debt where the debtor's budget included items such as cable television. On the other hand, many courts have allowed student loan debts to be discharged, or have upheld a lower court's grant of student loan discharge, when the budget included cable television.[20] Similarly, Gerhardt's internet access is used in part for his work for researching and receiving various musical pieces. The health club membership alleviates his arm and back pain, and assists him in maintaining his physical shape to remain employed in an extremely competitive and physically demanding job. Expenses related to his cat are not luxuries, considering that he is single, and lives alone.[21] Thus, the court cannot agree with the defendants' assertions that these four categories of expenses can be eliminated.

Neither is the court persuaded by the defendants' arguments that Gerhardt's telephone bill and car repair expenses are too high.

Further, even if the defendants are correct, Gerhardt's monthly expenses exceed his monthly income by some $150.[22] No money has been allocated for emergencies or unexpected expenses, and it does not appear that he has any insurance other than car insurance.[23]

The debtor has reduced his expenses to a bare minimum. He lives in a one bedroom, 600 sq. ft. apartment. He drives a 1994 Saturn, and has no assets other than his personal effects. He has no credit card debt. The court concludes that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself if he is forced to repay his student loans, which presently total $97,343.68.[24]

Gerhardt has proved the first prong of the *Brunner* test.

C. *Additional circumstances indicating this state of affairs is likely to persist for a significant portion of the repayment period*

■ The second prong requires a showing that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans. This prong properly recognizes the potential continuing benefit of an education, and imputes to the meaning of "undue hardship" a requirement that the debtor show the dire financial condition is likely to exist for a significant portion of the repayment period.[25] Accordingly, "the dischargeability of student loans should be based upon the certainty of hopelessness, not simply a

---

19. 189 B.R. 382, 385–86 (W.D.Va.1995).

20. *See, e.g., In re Ford*, 269 B.R. 673, 676 (8th Cir. BAP 2001); *In re Speer*, 272 B.R. 186, 190 (Bankr.W.D.Tex.2001); *In re Gotay*, 258 B.R. 531.

21. *See In re Speer*, 272 B.R. at 188, 190 (Discharge of student loan allowed although expenses included $10 per month for dog food.)

22. $1,680.47–$1,829.39 = $148.92

23. *See In re Speer*, 272 B.R. at 189.

24. *See* Finding of Fact # 5.

25. *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir.1993).

present inability to fulfill financial commitment."[26]

■ The evidence indicates that Gerhardt's present financial condition will likely continue. He works at the LPO, where it is unlikely that his salary will increase, and it may even decrease. His tax returns indicates that his income has not fluctuated much. He has attempted to increase his salary by auditioning for other, higher-paying orchestras. He teaches part time at Tulane University, and has investigated other teaching opportunities in the local area. He does private gigs as they become available.

The defendants argue that Gerhardt is voluntarily underemployed, and cite the case of *In re Grigas,*[27] for the proposition that "a debtor cannot satisfy the second prong of the *Brunner* test when his or her financial distress is self-imposed." The defendants assert that Gerhardt must broaden his job search to include other positions in the music field, other teaching positions, or jobs outside the music field that would offer higher compensation. The defendants contend that Gerhardt's position is similar to that of the debtor in the case of *In re Holzer.*[28]

These arguments are without merit. There is no evidence that Gerhardt can find other positions in the music field or jobs outside the music field that would offer higher compensation.[29] The debtor's only training is in music, and specifically, in playing the cello. The intense competi-

tion in this field was made plain by the evidence, which this court finds to be credible.

The cases cited by the defendants are not applicable. The debtor in *Holzer*[30] was not employed at all, and attempted to discharge his debts based on the fact that he was unemployed. In *Grigas,*[31] the debtor was seeking employment only in the field of art, although she had experience in office administration and secretarial work. Gerhardt has no other training but music, and has made a living as a musician all of his working adult life. Further, if Gerhardt were to take on a part time job in another field, he might well lose the job he has because of the time required to practice the cello, and his time commitments to the LPO.

The debtor has proved the second prong-that his dire financial condition is likely to exist for a significant portion of the repayment period.

### D. *Good faith effort to repay the loans*

■ The third prong is that the debtor has made good faith efforts to repay the loans. A good faith effort to repay the loans is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses.[32] Furthermore, undue hardship encompasses a notion that debtors may not willfully or negligently cause their own default, but rather their condition must result from "factors beyond [their] reasonable control."[33]

---

**26.** *Id.* at 1136, *citing, In re Briscoe,* 16 B.R. 128, 131 (Bankr.S.D.N.Y.1981).

**27.** 252 B.R. 866, 875 (Bankr.D.N.H.2000).

**28.** 33 B.R. 627 (Bankr.S.D.N.Y.1983).

**29.** *See In re Speer,* 272 B.R. at 195 ("[A]s is always the case, the educational loan creditor presented no evidence [that debtor is capable of other, more lucrative employment]—it sim-

ply and boldly made the unsubstantiated assertion.")

**30.** 33 B.R. 627.

**31.** 252 B.R. at 875.

**32.** *Roberson,* at 1136.

**33.** *Id.*

Gerhardt has worked consistently since he graduated from college, except while he was studying for his master's degree. The debtor is presently working, and his expenses are not unreasonable. The debtor has made some payments on the student loans.[34] He obtained three forbearances during his repayment of the loans, immediately after college in 1980, in 1983 before becoming employed with the Columbus Symphony, and in 1989, immediately after graduating from the master's program. These forbearances were sought in order to enable him to become employed, which he subsequently did. He made payments on the loans after the forbearances. All of the circumstances dictate that the debtor has consistently made a good faith effort to obtain employment, to maximize his income, and to minimize his expenses.

The debtor has proved the third prong of the *Brunner* test.

The defendants argue that Gerhardt's lack of good faith is evidenced by his reason for filing for bankruptcy—solely to discharge the student loans. The defendants assert this purpose is against the policy underlying Section 523(a)(8), and that courts have held that debtors filing bankruptcy solely to discharge student loan debt have not acted in good faith. The defendants cite the cases of *In re*

*Andresen,*[35] *In re Bethune,*[36] *In re Woyame,*[37] *In re Silliman,*[38] *In re Koch,*[39] and *In re Boston*[40] for this proposition.

The court is not persuaded. The first case, *In re Andresen,* addressed the issue of partial discharge of student loans, and set forth the policy for the student loan discharge exception, stating that "[t]he exception to discharge was created to rescue the student loan program from insolvency, and to prevent abuse of the bankruptcy process by undeserving student debtors".[41] The court has no quarrel with this broad policy pronouncement.

The remainder of the cases cited by the defendants on this point—*Bethune, Woyame, Silliman, Koch,* and *Boston,* all adopt and use a three part test from the case of *In re Johnson.*[42] The third prong of *Johnson,* consisting of the "policy test," considers whether the circumstances indicate (a) that the dominant purpose of the bankruptcy petition is to discharge the student debt, or (b) that the debtor has definitely benefitted financially from the education which the loan helped to finance.[43] As discussed above, the majority of courts have adopted the *Brunner* test, and not the *Johnson* test. The *Johnson* test is less commonly used than the *Brunner* test, and its third prong has been criticized by

34. Gerhardt argues that not all of the loans allegedly due to the creditors were received by his graduate school, and therefore, are not loans under the definition of Section 523(a)(8). Pl. 49, Debtor's Post Trial Memorandum, at 8–9. This argument was considered and rejected by the Fifth Circuit in an opinion entered on March 5, 2002, which held that it is the purpose and not the use of the loan that controls. *In re Murphy,* 282 F.3d 868 (5th Cir.2002).

35. 232 B.R. 127, 130 (8th Cir. BAP 1999).

36. 165 B.R. 258, 261 (Bankr.E.D.Ark.1994).

37. 161 B.R. 198 (Bankr.N.D.Ohio 1993).

38. 144 B.R. 748 (Bankr.N.D.Ohio 1992).

39. 144 B.R. 959, 964, 966 (Bankr.W.D.Pa. 1992).

40. 119 B.R. 162, 165 (Bankr.W.D.Ark.1990).

41. 232 B.R. at 130 [internal quotations omitted].

42. 5 B.C.D. 532 (Bankr.E.D.Pa.1979).

43. *Roberson,* 999 F.2d at 1135.

the jurisprudence.[44] The Third Circuit, which adopted the *Brunner* test, stated:

> Although in a different format, the *Johnson* test addresses the same three requirements as *Brunner*, but proceeds to implement an additional "policy test." Because the *Brunner* requirements effectively weed out those bankruptcy petitions primarily aimed at avoiding repayment of student loans (the first inquiry under the *Johnson* policy test), we see no need for the application of a separate policy test. More importantly, the second prong of the *Johnson* policy test improperly considers whether the debtor "has definitely benefitted financially from the education which the loan helped to finance." 5 Bankr.Ct.Dec. at 544. Such an inquiry conflicts with the basic concept of government-backed student loans.[45]

This court agrees with the Third Circuit in *Roberson* that there is no need for a separate policy analysis.[46] The defendants' argument is unavailing.

The court concludes that Gerhardt has proved that undue hardship will result unless his student loans are discharged based upon the *Brunner* test.

---

44. *See Roberson*, 999 F.2d at 1136; *In re Sands*, 166 B.R. 299, 305 n. 8 (Bankr.W.D.Mich.1994)(Adopting the *Brunner* test, and noting that *Brunner* does not require the policy analysis of part three of the *Johnson* test); *In re Dennehy*, 201 B.R. 1008 (Bankr.N.D.Fla.1996)("It is the [third] prong of the test that has led other courts to reject the Johnson test."); *In re Hawkins*, 187 B.R. 294, 298 (Bankr.N.D.Iowa 1995)(Adopting *Brunner* based upon the analysis of the Third Circuit in *Roberson*); *In re Shankwiler*, 208 B.R. 701, 705 (Bankr.C.D.Cal.1997)(Adopting

the *Brunner* test over the *Johnson* test); *In re Lehman*, 226 B.R. 805, 809 (Bankr.D.Vt. 1998)("[W]e will not apply the *Johnson* test in light of the widely-adopted *Brunner* test.")

45. *Roberson*, 999 F.2d at 1136.

46. The court further notes that the defendants cited the *Brunner* case, and analyzed the case according to its parts. *See* Pl. 52, Defendants' Post Trial Memorandum.