**In re Jose H. COTA and Sandra M. Cota, Debtors.**

**Jose H. Cota and Sandra M. Cota, Plaintiffs,**

**v.**

**U.S. Department of Education, et al., Defendants.**

**Bankruptcy No. 4–00–004064–TUC–EWH.**
**Adversary No. 02–0022.**

United States Bankruptcy Court, D. Arizona.

Sept. 2, 2003.

Ronald Ryan, Tucson, AZ, for Debtors/Plaintiffs.

Madeleine C. Wanslee, Gust Rosenfeld P.L.C., Phoenix, AZ, for Defendants.

## AMENDED MEMORANDUM DECISION

EILEEN W. HOLLOWELL,
Bankruptcy Judge.

### INTRODUCTION

The Debtors are seeking, pursuant to 11 U.S.C. § 523(a)(8), to discharge the student loan obligations of Jose H. Cota. For the reasons set forth below, the court finds that the Debtors are entitled to relief.

---

1. Except where noted, all references to exhibits refer to those admitted at the June 26, 2003 trial. In Defendant's Exhibit 10, a Proof of Claim dated March 2001 and submitted by ECMC, there are two loans listed for a total of $6,889.14 ($5,555.75 principal, $1,333.39 unpaid interest and fees).

### FACTUAL BACKGROUND

In 1988, Jose Cota, who was then approximately 21 years old, decided to attend the "International School aka the Construction School" (Construction School) to obtain training as an electrician. He chose the Construction School after seeing ads on television and hearing about it from friends. He was in one of the earliest classes at the school. He testified that he did not research the quality of the school. He attended the school between October 1988 and February 1989. Between October 1988 and February 1989, Mr. Cota took out three loans, at variable rates of interest between 6.71% and 6.94%, totaling $6,625.00 (Student Loan Obligation) to assist him in paying for tuition and other costs related to his attendance at the Construction School. In February 2001, all of the loans were assigned to Educational Credit Management Corporation (ECMC) by the U.S. Department of Education.[1]

Mr. Cota completed the training and obtained a certificate, but he has never been able to work as an electrician. Indeed, he failed tests given to him by potential employers seeking certified electricians. While the Construction School advertised that it provided job placement services, Mr. Cota never received any placement services before the school closed in June 1990.[2]

Ultimately, Mr. Cota pursued work in the construction field as a stucco worker. He testified that stucco workers are one of the highest paid specialists in construction, but due to a back injury, he can no longer work as a supervisor and has recently had

---

2. Had the Construction School closed while Mr. Cota was a student or within 90 days after he completed his program, he would be entitled to a discharge of the Student Loan Obligation pursuant to 34 CFR 682.402.

his pay reduced by $2.00 per hour from $15.00 to $13.00.

Mrs. Cota works as a home health worker for Pima County. Her work hours vary based on the number of patients who need care. In 2002, due to a lack of patients, Mrs. Cota obtained another job at Toys–R–Us. In 2002, after receiving a pay raise from Pima County and working a second job, her gross income was $14,677.00. Prior to 2002, Mrs. Cota testified that her annual gross income ranged from $9,000 to $13,000.00. Pay stubs for June 12–18, 2003 for Mr. Cota, and June 1–14, 2003 for Mrs. Cota (Pay Stubs) were submitted into evidence during the trial. Amended Schedules I & J were also entered into evidence.

The Pay Stubs indicate that Mr. Cota's current weekly gross income is $520.00 and his weekly net income is $310.11, while Mrs. Cota's current bi-weekly gross income is $699.51 and her bi-weekly net income is $501.94. The Debtors' combined net monthly income at the time of trial was $2,431.42.[3] The Debtors' projected 2003 annual net income, based on annualizing the Pay Stubs, will be $29,176.16, and their annual gross income will be $45,227.26. However, the annualized numbers overstate their 2003 income because it is unlikely that either Debtor will work eight hours a day, five days a week for 52 weeks. Mr. Cota testified that his wife's work schedule can be quite sporadic because the number of patients she cares for often changes. There was no evidence presented as to whether Mr. Cota is entitled to any paid time off for vacations or sick time. The Debtors' adjusted gross income in 2002, when Mrs. Cota worked two jobs, was $42,736.00. The court finds the Debtors' 2002 income to be a realistic indication of the Debtors' annual gross income for 2003.

The Debtors' current expenses as set forth in Amended Plaintiff's Exhibit J are as follows:

| | | |
|---|---|---:|
| Rent or Mortgage Payment | | $ 504.00 |
| Utilities: | Electricity & heating fuel | $ 175.00 |
| | Water | $ 85.00 |
| | Telephone | $ 45.00 |
| | Cable | $ 40.00 |
| Home maintenance (repairs & upkeep) | | $ 40.00 |
| Food | | $ 600.00 |
| Clothing | | $ 50.00 |
| Laundry & dry cleaning | | $ 40.00 |
| Medical & dental expenses (not covered by insurance) | | $ 50.00 |
| Transportation (not including car payments) | | $ 160.00 |
| Recreation, clubs & entertainment, newspapers, magazines, etc. | | $ 50.00 |
| Insurance (not deducted from wages or included in home mortgage payments) | | |
| | Life | $ 32.00 |
| | Auto | $ 38.00 |
| Installment payments | | |
| | Other: Refrigerator rental | $ 100.00 |
| | Other: Day care co-pay | $ 80.00 |
| Miscellaneous & Unexpected | | $ 75.00 |
| Household non-perishable supplies | | $ 25.00 |
| TOTAL MONTHLY EXPENSES | | $ 2,189.00 |

**3.** The Pay Stubs reflect $531.27 less than the $2,962.61 monthly net income listed on Amended Schedule I.

In addition, Mr. Cota testified that he rents a washer/dryer for $98.00 per month. If that amount is included, the Debtors' total monthly expenses are $2,287.00.

Mr. Cota is 36 years of age. Mrs. Cota is 35 years of age. The Cotas have eight children residing in their household. Their eldest child was born in 1986 and the youngest child was born in 1999.[4] In addition, Mr. Cota has three other children who, at the time of trial, were 9, 11 and 13. Mr. Cota's wages are currently being garnished $572.00 per month for child support for those children. Only $396.00 of that amount is due for regular child support. (See Def.'s Ex. 13.) An additional $130.68 has been garnished to pay for child support arrearages, which Mr. Cota testified exceeded $10,000.00 three years ago. However, Mr. Cota is now current on all child support arrearages as a result of the wage garnishments and seizure of his tax refunds. Nevertheless, $130.68 is still being withheld from his pay monthly. An additional $40.00 per month is deducted from his pay for medical insurance premiums for the children who do not live with him. Because the child support arrearages have been paid, Mr. Cota's gross income should increase by $130.68 in the near future.

During the trial, there was a dispute between the Plaintiffs and ECMC as to whether the Debtors, who are currently making a $200.00 payment each month under a Chapter 13 Plan, have excess income.[5] After the trial, the court reviewed the Pay Stubs, and has determined that the Debtors currently have "excess income," after payment of expenses, including the unlisted washer/dryer, of $144.34 a month ($2,431.42—$2,189.00 = $144.34). As noted above that number may increase if and when Mr. Cota is successful in adjusting the amount of his child support garnishment. The court has calculated that when the garnishment for child support arrearages is terminated, Mr. Cota's net income should increase by $67. The Debtors are currently paying $200.00 a month to the Chapter 13 Trustee and will continue to do so until the end of their 60–month plan term in November of 2005. Therefore, until November 2005, the Debtors' "excess" income will be $11.34 per month ($144.34 + $67 = $211.34—$200.00 = $11.34).

Mr. Cota testified that he had made one or two voluntary payments on the Student Loan Obligation in either 1988 or 1989, but had no documentary evidence to back up his assertions. ECMC's payment history, admitted as Defendant's Exhibit 17, however, indicated that voluntary payments were made on February and March 1999

4. The names and birth dates of the children who live with the Debtors were listed in the Joint Pre–Trial Statement (Plaintiffs' Exhibit B). The eldest was born in August of 1986, and the youngest was born in November of 1999.

5. Counsel for ECMC spent close to an hour cross-examining Mr. Cota, making him do calculations on her hand-held calculator while she posted numbers on an easel. Those numbers purportedly demonstrated that the Debtors' actually have $303.00 in additional income (before payment of $200.00 to the Chapter 13 Trustee) than was set forth in the Pre-trial Statement, where Debtors' counsel erroneously deducted Mr. Cota's child support payment twice. However, ECMC's counsel did not offer her trial calculations into evidence and the court, therefore, cannot compare its review of the admitted trial exhibits with ECMC's counsel's demonstrative trial calculations. Accordingly, the court has relied on the exhibits actually admitted at trial in determining the amounts of Debtors' monthly income.

in the amount of $168.00 each.[6] Defendant's Exhibit 17 indicates that approximately $10,782.66 has been repaid on the Student Loan Obligation. All but $336.00 of the payments were made by wage garnishment or set-offs against Mr. Cota's tax refunds. As of February 26, 2002, the parties' stipulated that the balance due on the Student Loan Obligation was $7,655.97. No breakdown was provided by ECMC of what portion of that number constitutes interest, collection fees or costs. ECMC also did not present any evidence which explained how the payments set forth in Defendant's Exhibit 17 had been applied so that the balance remaining on the Student Loan Obligation was $7,655.97 as of February 2002. Interest continues to accrue on the Student Loan Obligation at the rate of the original loans, which, according to ECMC's counsel, was around 3.4% at the time of trial. Unpaid interest is capitalized annually on the Student Loan Obligation because Mr. Cota elected that option in his application for the loans. (*See* Def.'s Ex. 3.)

On October 24, 2000, the Debtors filed a Chapter 13 Petition. The Debtors confirmed their Chapter 13 Plan on September 12, 2001, which provided for the curing of $2,500.00 in mortgage arrears. Under the Debtors' original plan, the plan payment was $450.00 a month for the first 24 months and $715.00 for an additional 36 months. On December 21, 2001, the Debtors, after surrendering their vehicle, filed a Motion to Modify their plan which reduced the amount of the plan payments to $200.00 for the remaining 60-month term. Under the Modified Plan, the Debtors are curing arrearages on their mortgage of $5,863.47. This adversary proceeding was filed on February 12, 2002. A Modified Order of Confirmation was entered on March 12, 2003. Currently, the Debtors share the use of one car—a 1988 Oldsmobile which they are borrowing from a relative.

The Modified Order of Confirmation included a provision that no payments are to be made on the Student Loan Obligations either outside or through the plan. At the time of trial, Mr. Cota testified that he thought the Student Loan Obligation could not be paid pro rata with other unsecured claims because the Chapter 13 Trustee would object. Debtors' counsel claimed to have no memory that there was a provision in the Modified Confirmation Order prohibiting payments of the Student Loan Obligation as a general unsecured claim. When that term was pointed out to him by ECMC's counsel, Debtors' counsel said it was a mistake.

Mr. Cota has never applied to the Department of Education for any type of repayment plan and has not, since the filing of this adversary proceeding, made a settlement proposal to ECMC. In response to a question from the court about what repayment plans were available to Mr. Cota, ECMC's counsel replied that she faxed a William D. Ford Federal Direct Loan Program repayment application to Debtors' counsel and sent Debtors' counsel

---

6. The court used the key for the codes set forth on the "explanatory" front page of Defendant's Exhibit 17 to determine if any voluntary payments were made. The payments made in February and March of 1999 are coded as "RG–VO" which stands for "regular voluntary payment." When a payment is made by garnishment, the code is "RG–WG" which stands for "wage garnishment." Defendant's Exhibit 17 incorrectly combines Cota's two voluntary payments totaling $336.00 with the wage garnishments totaling $2,931.36 and lists the total of $3,267.36 as "voluntary" payments. The Debtors' did not dispute that all payments listed in Defendant's Exhibit 17 as RG–WG were made by wage garnishments.

an email explaining the program.[7] Neither the email or fax were offered into evidence. ECMC's counsel did not know which of the William D. Ford programs the Debtors might qualify for, but suggested that they would probably be eligible for the Income Contingent Repayment Plan (ICR). ECMC's counsel further suggested that under the ICR, due to the large number of their dependents, the Debtors would probably not currently have to make any payments on the Student Loan Obligation.

On June 26, 2003, trial was conducted on the Plaintiffs' Complaint. Mr. Cota was the sole witness. The trial was concluded on that date and the matter is now ready for determination by this court.

### ISSUES

1. Are the Debtors capable of paying the Student Loan Obligation while maintaining a minimal standard of living?

2. Are the Debtors' financial circumstances likely to persist for a significant portion of the repayment period?

3. Has Mr. Cota made a good-faith effort to repay the Student Loan Obligation?

4. Should Mr. Cota be granted a partial discharge?

### JURISDICTIONAL STATEMENT

The court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and (b). In addition, this matter is ripe because, pursuant to Federal Rule of Bankruptcy Procedure 4007(b) and § 523(a)(8)(B), an action seeking discharge of a student loan can be brought at any time. *In re Taylor,* 223 B.R. 747, 751 (9th Cir. BAP 1998); *see also In re Ekenasi,* 325 F.3d 541, 546 (4th Cir.2003).

### DISCUSSION

#### I. Introduction

In deciding whether excepting the Student Loan Obligation from Mr. Cota's discharge will constitute an undue hardship, the court must apply the three-part *Brunner* test (*Brunner* Test). *In re Brunner,* 46 B.R. 752, 756 (S.D.N.Y.1985), *aff'd,* 831 F.2d 395, 396 (2nd Cir.1987), *adopted by, In re Pena,* 155 F.3d 1108, 1112 (9th Cir. 1998).[8] Under the *Brunner* Test, Mr. Cota has the burden of proving by a preponderance of the evidence that:

1. The Debtors cannot, based on current income and expenses, maintain a minimal standard of living and repay the Student Loan Obligation;

2. Additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period; and

3. The Debtor has made a good faith effort to repay the debt.

*Brunner,* 46 B.R. at 756.

#### II. Applying Brunner

##### A. Minimal Standard of Living

###### 1. Excess Income Analysis

▉ In order to determine if a debtor can maintain a minimal standard of living if required to pay a student loan debt, the court must review the income and expenses of the debtor at the time of trial. *Pena,* 155 F.3d at 1113. As set forth in

---

7. There are four types of plans (standard repayment plan, extended repayment plan, graduated repayment plan, and the income contingent repayment plan) offered under the William D. Ford Federal Direct Loan Program, 34 C.F.R § 685.208 (2003).

8. While the *Brunner* Test has been adopted in a number of circuits, in the Eighth Circuit it appears that the test is a "totality of the circumstances." *See Andrews v. South Dakota Student Loan Assistance Corp.,* 661 F.2d 702, 704 (8th Cir.1981).

the factual summary, the court has relied on the Debtors' Pay Stubs and most recent tax returns in determining the Debtors' income and has relied on the Debtors' Amended Schedule J and Mr. Cota's testimony at trial in determining the Debtors' expenses.

A "minimal" standard of living requires more than a showing of tight financial circumstances. *In re England,* 264 B.R. 38, 45 (Bankr.D.Idaho 2001). At the same time, Debtors are not required to live "at or below the poverty level to be entitled to a fresh start." *Frattini, The Dischargeability of Student Loans: An Undue Burden?* 17 BANKR. DEV. J. 537, 573 (2001). In assessing whether debtors have adopted a minimal standard of living, one court has remarked that "minimal" is "a flexible and subjective term that can only have objective meaning in light of the particular facts of each case." *In re Afflitto,* 273 B.R. 162, 170 (Bankr.W.D.Tenn.2001). The task for the court in assessing the first prong of the *Brunner* Test is to determine "whether the debtor can afford, with reasonable efforts to repay all or part of a student loan while adequately supporting the debtor and any dependents." *Id.*

The Debtors are responsible for supporting their eight children. In addition, Mr. Cota is obligated to support his three other children. Under the 2003 HHS Poverty Guidelines, a family of ten is living at a poverty level if their Adjusted Gross Income is $36,580.00 or less.[9] In this case, the Debtors' Adjusted Gross Income in 2002 was $42,576.00. In addition, Mr.

Cota must pay approximately $5,232.00 in child support per year for his three other children ($396.00+ $40.00 (medical insurance) × 12 = $5,232.00). If that number is subtracted from the Debtors' Adjusted Gross Income of $42,576.00, it is apparent that the Debtors are living near the poverty level ($42,576.00—$5,232.00 = $37,344.00).

■ In determining what constitutes a minimal standard of living the court takes judicial notice of the guidelines used by Chapter 13 Trustee in Tucson for debtors' expenses (Trustee's Guidelines), as well as the guidelines used by the IRS in determining what expenses taxpayers should be allowed when they are in a collection status with the IRS (IRS Guidelines), both of which are public documents.[10] *See e.g., Knox v. Butler,* 884 F.2d 849, 852 (5th Cir.1989)(holding that judicial notice of census data may properly be taken on habeas review); *Aiello v. Town of Brookhaven,* 136 F.Supp.2d 81, 117 (E.D.N.Y.2001)(holding that a court considering the economic profile of residents affected by alleged environmental damage could take judicial notice of federal census records).

The court has attached as Exhibit 1 to this Memorandum Decision its comparison of the Cotas' expenses, exclusive of their Chapter 13 Plan payment of $200.00, to the Trustee's Guidelines and to the IRS Guidelines. *See e.g., In re Brown,* 249 B.R. 525, 528 (Bankr.W.D.Mo.2000). It demonstrates that the Cotas, whose monthly expenses are $2,189.00, are living well below

---

**9.** The 2003 guidelines reflect price changes through calendar year 2002 and are approximately equal to the poverty thresholds for calendar year 2002. *Annual Update of the HHS Poverty Guidelines,* 68 Fed.Reg. 6456–03 (Feb. 7, 2003).

**10.** The IRS Guidelines are available at *www.irs.gov/businesses/small/arti-*

*cle/0,,id=104627,00.html;* The Chapter 13 Trustee's Guidelines are available from the Trustee's office and routinely made available to Chapter 13 debtors and the lawyers who represent them. The Chapter 13 Trustee's Guidelines are attached as Exhibit 2 to this Memorandum Decision.

the amounts allowed by either set of guidelines. The Chapter 13 Trustee's guidelines would allow the Debtors expenses of $4,790.65. The IRS Guidelines would allow them expenses of $3,762.00. Both amounts are far in excess of even the theoretical $303.00 of excess income ECMC alleges the Debtors could squeeze out of their current budget. Furthermore, the Debtors' current budget includes shockingly low amounts in a number of categories including $600.00 a month to feed a family of ten. The fact that the Debtors were unable to retain ownership of a vehicle and that Mr. Cota fell behind on his child support obligations in an amount almost equal to what ECMC collected by garnishment and seizure of tax refunds demonstrates that the Debtors currently have no "excess" income with which to make payments on the Student Loan Obligation.

The record indicates that the Debtors are living at or near the poverty level so they that they can make the $200.00 a month Chapter 13 Plan payment in an effort to save their home from foreclosure. At the time the Debtors filed their Chapter 13 case, they had $2,500.00 in mortgage arrears. On December 21, 2001, the mortgage lender sought stay relief, which resulted in the Debtors filing their Modified Plan, surrendering their only vehicle. They also sought a moratorium on plan payments so they could try to "catch up" on their mortgage payments. Ultimately the amount of the mortgage arrears grew to over $5,000.00 and it is being paid under the Modified Plan. Adopting the approach of the *Afflitto* case, the court finds that the Debtors cannot currently afford to pay all or even a portion of the Student Loan

Obligation while adequately supporting their dependents.

### 2. *Effect of Filing of Chapter 13*

■ ECMC argues that the Debtors are premature in seeking relief from the Student Loan Obligation because there are still over two years left before the completion of their Chapter 13 Plan in November of 2005. *See In re Pair*, 269 B.R. 719, 720–21 (Bankr.N.D.Ala.2001); *In re Soler*, 250 B.R. 694, 697 (Bankr.D.Minn.2000). However, under Federal Rule of Bankruptcy Procedure 4007(b) and § 523(a)(8)(B) an action seeking discharge of a student loan can be brought at any time. *Taylor*, 223 B.R. at 751; *Ekenasi*, 325 F.3d at 546.

■ In this case, the Debtors have asserted that because their expenses are so far below what is allowed under the Chapter 13 Trustee Guidelines, it is clear that they will still satisfy the first prong of the *Brunner* Test when their Chapter 13 Plan is completed. The court agrees. Even after the Debtors are not making plan payments of $200.00 a month, they will nonetheless need that $200.00 to maintain a minimal standard of living. For example, if the Debtors were to use the $200.00 a month to pay for the acquisition of a car, that would still be below the $240.00 permitted under the Chapter 13 Trustee's Guidelines. Debtors may own a car and still satisfy the undue hardship requirements of 11 U.S.C. § 523(a)(8). *See In re Rifino*, 245 F.3d 1083, 1088 (9th Cir.2001). In addition the Debtors, who are a family of 10 including several teenagers, could justifiably add $200.00 to their $600.00 a month food budget, and still fall within the Chapter 13 Trustee Guidelines for food.[11] Even after they complete their Chapter 13

---

11. The Trustee Guidelines permit $405.00 per couple + $150.00 for each pre-teen child and $175.00 for each teenager, so Debtors could spend close to $2,000 a month on their food budget and still fall within the Trustee Guidelines.

Plan, the Debtors will not, based on their income and expenses, be able to maintain a minimal standard of living for themselves and their dependents and pay the Student Loan Obligation. The court finds, therefore, that the Debtors have satisfied the first prong of the *Brunner* Test.

### B. *Additional Circumstances*

 The second prong in the *Brunner* Test requires that the court determine if the state of affairs the Debtors are currently enduring is likely to persist for a significant portion of the "repayment period." *Brunner*, 46 B.R. at 756. There is no statute of limitations for a student loan debt. *See* 20 U.S.C. § 1091a(a)(1). The court, therefore, will adopt the twenty-five year repayment period used under the ICR. *See In re Wynn*, 270 B.R. 799, 804 (Bankr.S.D.Ga.2001) ("I must decide if debtor will be unable to maintain a minimal standard of living for the maximum 25–year term if required to pay back the loans").

The Debtors are living below a minimal standard of living in large part because of their large number of children. The Debtors have eight children under the age of 16. In addition, Mr. Cota has child support obligations of $436.00 a month for three other children between the ages of 9 and 13.

No evidence was presented that any of Mr. Cota's children are sick or have a continuing debilitating condition. ECMC argues, therefore, that eventually, as the children reach the age of 18, that the Debtors' financial condition will improve. While, hopefully, all of Mr. Cota's children will reach the age of 18 safe and sound, six of his children, including two who do not live with him are still under the age of 12.

Only three of his children will be 18 in the next three years. Furthermore, for the next 15 years, as the children grow up, the cost of supporting them will increase, making the possibility of any payment on the Student Loan Obligation during that 15–year period unlikely. However, interest will continue to accrue on the Student Loan Obligations and, after 15 years, the outstanding balance of the Student Loan Obligation will have increased exponentially. By the time that the Debtors will arguably have any excess disposable income, Mr. Cota will be somewhere between 45 and 50 years of age and the outstanding balance on the Student Loan Obligation will have increased 40% or more.[12]

At trial, ECMC asserted that the number of Mr. Cota's children was a matter of choice and therefore should not be considered an additional circumstance since it was within Mr. Cota's power to control the number of his children. No reason was given as to why Mr. Cota has 11 children. The court, therefore, has no way of knowing if it is a matter of Mr. Cota's choice or a matter of Mr. Cota's religious and/or moral convictions. However, it does not matter *why* Mr. Cota has a large number of children because he did not agree to waive his right to procreate when he incurred the Student Loan Obligation. ECMC's argument in this vein simply has no merit.

 In *In re Ivory*, 269 B.R. 890, 910 (Bankr.N.D.Ala.2001), the court confronted a similar assertion by the student loan creditor that a debtor had waived any right to claim undue hardship because her decision to have children had "created or contributed to her financial hardship."

---

**12.** Taking the $7655.97 loan amount stipulated by the parties: this amount over 10 years at 3.4% interest (current government student loan rate) with capitalized interest annually becomes $10,695.61.

Judge Cohen reviewed the extensive body of Supreme Court law protecting an individual's rights to privacy and concluded "absent an unequivocal pronouncement from Congress or a court with authority to bind this Court, this Court will not find that an obligation to pay a student loan is superior to an individual's fundamental right of procreation." *Id.; see also In re Myers,* 280 B.R. 416, 422 (Bankr.S.D.Ohio 2002). This court agrees with the analysis of *Ivory* and, therefore, rejects ECMC's argument that the large number of Mr. Cota's children cannot constitute "additional circumstances" under the *Brunner* Test.

There was also evidence presented at the trial that Mr. Cota has a back problem and a strained sacrum. (*See* Def.'s Ex. 12.) Mr. Cota testified that while he has done everything he can to maximize his income by working as a stucco worker, he also testified that such work is physically demanding and his injury has led to inability to lift heavy objects and consequently a demotion and a reduction in his hourly wage. As this court has noted in other student loan dischargeability cases, it does not have a crystal ball to assist in determining what will happen in the future, however, the court sees no reason to assume that Mr. Cota's physical problems will improve as he grows older or that he will be able to substantially increase his wages above the rate of inflation.

As part of its analysis under the second prong of the *Brunner* Test, the court also may consider the value of Mr. Cota's education with respect to his future ability to repay the debt. *Pena,* 155 F.3d at 1108. Mr. Cota testified that the education he received was useless. It did not qualify him to be an electrician. The school did not provide him with promised job placement services. After receiving his "certificate," he failed entry level qualifying tests to work as an electrician. The school

closed shortly after Mr. Cota concluded the program. *See In re Speer,* 272 B.R. 186, 187 (Bankr.W.D.Tex.2001)(debtor was entitled to discharge of student loans, partly because trade school had improperly trained debtor and few graduates obtained jobs).

ECMC argues that the federal government has no obligation to assure that the quality of education students are paying for with their student loan proceeds is as advertised. In this case, the Construction School was given the right to loan out federal money to anyone who applied to the school without regard to the school's competency or honesty and without regard to whether there were actually any jobs in the marketplace for its graduates, assuming that the graduates would be properly trained, which they were not. *Speer,* 272 B.R. at 192. However, even though the federal government may not have any quality control obligations under its various student loan programs, the Ninth Circuit has held that the lack of any economic benefit to a debtor is a factor to be considered in the debtor's favor in considering whether additional circumstances exist, which make it likely that the debtor will continue to be unable to repay a student loan obligation and maintain a minimum standard of living. *Pena,* 155 F.3d at 1112; *see also In re Kirchhofer,* 278 B.R. 162, 170 (Bankr.N.D.Ohio.2002); In re Wilcox, 265 B.R. 864, 871 (Bankr.N.D.Ohio. 2001); *In re Correll,* 105 B.R. 302, 306 (Bankr.W.D.Penn.1989).

ECMC also argued at trial that Mr. Cota should have affirmatively investigated the quality of the Construction School. However, Mr. Cota, an immigrant with no post-secondary education, testified that the school was relatively new when he enrolled and incurred the Student Loan Obligation. It is unclear what ECMC thinks Mr. Cota could or should have done. Mr. Cota is

not a college graduate who could have investigated the pros and cons of various post-graduate programs. The court is at a loss to know what sort of investigation Mr. Cota could have pursued which would have informed him of the dangers associated with attending a trade school. Moreover, ECMC presented no evidence, by way of expert testimony or otherwise, as to what such an investigation would have revealed, or how it should have been conducted.

Considering the large number of Mr. Cota's children, the time remaining before those children reach legal age, the fact that the Cotas are young enough to have more children, Mr. Cota's physical condition, the variable nature of Mrs. Cota's income, and the fact that the education Mr. Cota obtained was useless, the court finds that the Debtors have demonstrated by a preponderance of the evidence that additional circumstances exists, which indicate that the Debtors will be unable to maintain a minimal standard of living if Mr. Cota is compelled to repay the Student Loan Obligation. Accordingly, the Debtors have met the second prong of the *Brunner* Test.

### C. *Good Faith*

The third prong of the *Brunner* Test requires that Mr. Cota demonstrate that he has made a good faith effort to repay the Student Loan Obligation. "With the receipt of a government guaranteed education, the student assumes an obligation to make a good faith effort to repay these loans as measured by his or her efforts to obtain employment, maximize income and minimize expenses." *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993). In this case, Mr. Cota has made a good faith effort to obtain employment as an electrician, but has been unable to do so because the substandard education he obtained did not qualify him for the work.

He has, therefore, taken work as a stucco worker in the construction field, which he testified is one of the highest paid jobs that can be obtained in the construction field. Both Mr. and Mrs. Cota work, so the court finds that they have made an effort to obtain employment and maximize their income. Based on the record of this case, there is no question that the Debtors have done everything to minimize their expenses. They do not own a car, and their monthly expenses are well below what is permitted under either the IRS Collection or Chapter 13 Trustee's Guidelines.

ECMC, however, argues that Mr. Cota cannot meet the good faith requirements of the *Brunner* Test because: (1) no voluntary payments were ever made on the Student Loan Obligation; (2) Mr. Cota has failed to seek repayment alternatives available from the Department of Education, such as the ICR; and (3) the terms of the Second Amended Plan, which preclude any payment of the Student Loan Obligation as a general unsecured claim, all arguably demonstrating Mr. Cota's lack of good faith.

#### 1. *Failure to Make Voluntary Payments*

It is *not* clear from the record that Mr. Cota has never made a voluntary payment on the Student Loan Obligation. He testified that he did, and Defendant's Exhibit 17 submitted by ECMC lists two payments on February 8, 1999 and March 8, 1999, which do not contain either a garnishment or forced payment code.[13] The court, therefore, finds that Mr. Cota, in fact, has made voluntary payments totaling less than $400 on the Student Loan Obligation.

13. *See* fn. 4., *supra.*

■ Even if Mr. Cota made no voluntary payments, "failure to make even minimal payments on student loans does not prevent a finding of good faith when the debtor never had the resources to make payments." *In re Brown*, 239 B.R. 204, 209 (S.D.Cal.1999); *see also, Speer*, 272 B.R. at 197 (citing *In re Lebovits*, 223 B.R. 265, 274 (Bankr.E.D.N.Y.1998), *and In re Clevenger*, 212 B.R. 139, 146 (Bankr. W.D.Mo.1997)). By the time Mr. Cota finished his program at the Construction School in 1989, he had three young children.[14] No evidence was presented that in September of 1989, when Mr. Cota should have begun making payments, that he had excess income available to do so. Further, evidence that there was not "excess income" from which to make payments is presented by the fact that, when ECMC began forced collection efforts on the Student Loan Obligation, Mr. Cota incurred arrearages of over $10,000.00 in his child support obligations. Furthermore, the inability of the Debtors to keep even one vehicle, and the very low amount they spend to feed eight children, indicates that there has not been extra money available to Mr. Cota to make payments on the Student Loan Obligation.

Even if Mr. Cota did not ever make a voluntary payment, because of his circumstances, the court finds that he may still satisfy the good faith prong of the *Brunner* Test.

### 2. *Failure to Participate in Alternative Payment Programs*

The United States Department of Education offers a number of student loan repayment options.[15] One of these is the ICR. *See* 20 U.S.C. § 1078(m); 34 C.F.R.

§ 685.209. Under the ICR, the annual amount payable by a borrower is the lesser of (a) the amount the borrower would repay annually over 12 years or (b) 20% of discretionary income. ECMC asserts that the failure of Mr. Cota to submit an application for the ICR or other repayment plan precludes him from meeting his burden of proof under *Brunner*. *See In re Birrane*, 287 B.R. 490, 500 (9th Cir. BAP 2002), (failure of a debtor, post-bankruptcy, to enter into negotiations with the student loan creditor regarding possible repayment plans, precluded the debtor from satisfying the burden of proof with respect to the good faith requirement of the *Brunner* Test); *see also In re Wallace*, 259 B.R. 170, 185 (C.D.Cal.2000) (a debtor's obligation to make good faith efforts to repay his educational loans is not extinguished with the filing of an adversary proceeding in bankruptcy).

■ The court agrees that the good faith requirement of *Brunner* requires that the court consider Mr. Cota's conduct in failing to explore alternatives, such as the ICR. However, the failure to explore such programs, especially if the programs offer no effective relief, is not *per se* an indication of a lack of good faith. As one court has noted, "the Department of Education may not usurp the judicial function of determining undue hardships by promulgating regulations governing the repayment of student loans. The ICR is a factor to be considered by the court in determining undue hardship, but it does not control the decision." *In re Herrmann*, 2000 WL 33961388 (Bankr.C.D.Ill.).

While debtors should not be permitted to try to obtain relief under 11 U.S.C. § 523(a)(8) before seriously considering

---

**14.** The Pre–Trial Statement indicates that Jose Cota, Jr. was born in 1986, Heriberto was born in 1987 and Monique was born in 1988.

**15.** *See* fn. 7, *supra*.

other payment alternatives, a debtor's failure to explore alternatives must be evaluated on a case by case basis. In this case, it is unclear if Mr. Cota ever understood that alternatives were available to him. At the commencement of the trial, the court asked ECMC what information about repayment plans were provided to Mr. Cota. ECMC's counsel stated that an application for the program and an explanatory email about the program had been sent to Debtor's counsel. Neither document was submitted into evidence. ECMC's counsel could not answer the court's questions about what would actually be available to Mr. Cota, but suggested that he would likely qualify for the ICR and due to his large number of children, would probably owe nothing currently, but that "the calculations" had not been done.[16] ECMC's counsel suggested that the court could undertake the analysis by using the Department of Education website.

The Department of Education maintains an interactive website which permits borrowers to determine what their payments would be based on the outstanding amount due on a loan and based on the debtors' gross income and family size. The Department of Education also makes available on its website the "Direct Loan Repayment Handbook" (Handbook) which provides worksheets which purportedly make it possible for a student loan obligor to determine what his or her payment amounts would be under the four types of programs.

The interactive loan calculator indicates that under the ICR guidelines, taking into account the Debtors' 2002 adjusted gross income and a family of 10, would require Mr. Cota to make payments of $78.73 for 145 months. Based on the Debtors' current income and expenses, it is clear that Mr. Cota could not make payments of even half that amount.[17] Even if the payments were $0 for the next year or two, interest will continue to accrue on the Student Loan Obligation and, therefore, the amount due will continue to grow. If the Student Loan Obligation amount has not been repaid after 25 years, the remaining amount would be canceled and discharged. However, the amount discharged would, under current tax law, be considered taxable income. *In re Thomsen*, 234 B.R. 506, 509–510 (Bankr.D.Mont.1999); *Herrmann*, 2000 WL 33961388 (Bankr. C.D.Ill.).[18]

As one court has noted:

[T]he William D. Ford Program is no silver bullet for student loan creditors to avoid discharge of student loan debts owing to undue hardship if the creditors fail to advise particular debtors of that or comparable programs and assist the debtors with pursuing them, or demonstrate that a particular debtor did in fact know about and understand such alternatives for resolving student loan debts.

*In re Cheney*, 280 B.R. 648, 664 (N.D.Iowa 2002); *see also In re Long*, 271 B.R. 322,

**16.** The logic of applying for a program that allows the debtor a $0 "payment" as a precondition to a finding of a debtor's good faith, is lost on the court.

**17.** If Mr. Cota is allowed to claim that his family size includes the three children who do not live with him his current payments would be $0. However, in order to claim those three children, Mr. Cota must be able to demonstrate that he pays 50% of their support. Given the amount of the monthly child support, it is unlikely Mr. Cota is paying 50% of their support.

**18.** *But see Birrane*, 287 B.R. at 500 (holding that it was not clear that the forgiveness of a student loan debt would be treated as taxable income). However, the Handbook unequivocally states that the amount forgiven will be treated as income and subject to taxation. Handbook at p. 6.

271 B.R. 322 (8th Cir. BAP 2002). In this case, there is no evidence that alternative programs were ever explained to Mr. Cota by ECMC, that ECMC assisted Mr. Cota in pursuing such programs, or that there was a viable alternative program even available.

### D. *Terms of the Debtors' Second Amended Plan*

ECMC argues that the provisions of the Modified Plan, which prohibit payment on the Student Loan Obligation as a general unsecured claim, demonstrates a lack of good faith by Mr. Cota. ECMC suggests that because Mr. Cota testified that he feels he was "cheated out" of an education, that he is therefore angry at ECMC and, therefore, deliberately omitted payment on the Student Loan Obligation under the Modified Plan. However, Mr. Cota's testimony indicated that he barely understands the provisions of his Modified Plan. The decision, therefore, to provide that the Student Loan Obligation would not be included in distributions to unsecured creditors was obviously made by Debtors' counsel. At trial, Debtors' counsel claimed that provision was not in the Modified Plan. After the term was pointed out to him, he acknowledged that it was "a mistake" and that the Modified Plan would be amended to remove it. The provision is a mistake and the Modified Plan must be amended to correct it. There is no evidence, however, that Mr. Cota actually participated in the decision to bar distributions to ECMC under the Modified Plan. Accordingly, the court does not find that the subject plan provision is a demonstration of the Mr. Cota's lack of good faith.

### III. *Partial Discharge*

In *In re Saxman,* 325 F.3d 1168 (9th Cir.2003), the Ninth Circuit determined that bankruptcy courts may exercise their discretion under 11 U.S.C. § 105(a) to par-

tially discharge a student loan debt. Significantly, the Ninth Circuit disagrees with the Sixth Circuit's decision of *In re Hornsby,* 144 F.3d 433 (6th Cir.1998), which permits a partial discharge even where a debtor fails to establish that paying back the student loan will create an undue hardship, if the debtor establishes the existence of "oppressive financial circumstances." Under *Saxman,* before a bankruptcy court can partially discharge a student loan debt, it must first find that the portion being discharged satisfies the requirements of the *Brunner* Test. *Saxman,* 325 F.3d at 1175. *See also In re Blair,* 291 B.R. 514, 519 (9th Cir. BAP 2003) ("A preliminary finding of undue hardship is necessary, before a bankruptcy court can exercise its equitable powers in granting a partial discharge of student loan debt").

 In this case, the court has determined that the Debtors have demonstrated by a preponderance of the evidence that they meet all three prongs of the *Brunner* Test. Nevertheless, under *Saxman,* the court, pursuant to 11 U.S.C. § 105 may elect to only discharge a portion of the debt. ECMC points out that over the five-year term of the Modified Plan the Debtors propose to pay mor than $13,000.00 to the Chapter 13 Trustee. ECMC argues that after the plan term the Debtors could simply continue to make payments of $200.00 a month for an additional five to six years, and thereby satisfy the Student Loan Obligation. ECMC also argues that the viability of the federal student loan program depends upon repayment by previous borrowers and, therefore, the Student Loan Obligation should not be discharged.

However, in this case, requiring the Debtors to live for another eight years well below a minimal standard of living is inconsistent with the recognized public policy purpose of the Bankruptcy Code of

providing debtors with a fresh start. *In re Riso*, 978 F.2d 1151, 1154 (9th Cir.1992)(excepting debts from discharge can significantly affect debtor's ability to make a fresh start and accordingly, all such exceptions are to be strictly construed in favor of debtor and against creditor); *see also In re Devers*, 759 F.2d 751, 754–55 (9th Cir.1985); *In re Klapp*, 706 F.2d 998, 999 (9th Cir.1983). While it is clear that student loan debt should not be discharged in cases of "garden variety" hardship, nevertheless 11 U.S.C. § 523(a)(8) does permit discharge of student loan obligations in cases of real and sustained undue hardship. This is a case where the Debtors are living below a minimal standard of living in order to keep their home. Once the Chapter 13 Plan is paid off, they will continue to struggle to house, feed and clothe their children.

In deciding to fully discharge the Student Loan Obligation, the court has also considered ECMC's collection of over $10,000.00. While the payment was largely involuntary, it was still payment, and it totaled more than the original amount borrowed. Finally, the facts of this case do not indicate that Mr. Cota is the type of debtor that Congress intended to deter by excepting student loan debts from discharge. He does not appear to have filed for bankruptcy protection "on the eve of a lucrative career," but rather sought the protections of Chapter 13 in order to prevent a foreclosure on his home. Mr. Cota's case is, therefore, distinguishable from those cases involving professionals who obtain substantial financial benefit or the prospect of financial benefit from the education they receive and then seek to avoid repayment by filing for bankruptcy.

## CONCLUSION

The Debtors have satisfied the *Brunner* Test and are entitled to a discharge of the Student Loan Obligation.[19] Counsel for the Debtor must within ten days of the date of this Memorandum Decision simultaneously submit an order amending the Modified Plan to delete the provision which prohibits any distribution to ECMC and a form of judgement consistent with the terms of this decision. The foregoing constitutes the court's findings of fact and conclusions of law pursuant to *Bankr.R.P.* 7052.

### EXHIBIT 1

**DEBTORS EXPENSE BUDGET COMPARED TO
CHAPTER 13 TRUSTEE GUIDELINES AND IRS STANDARDS**

The following are the maximum monthly allowances by the IRS, Chapter 13 Trustee and the actual amounts presently paid by the Debtors:

| Expense | IRS | Chapter 13 | Debtors |
|---|---|---|---|
| Housing & Utilities Living Expenses [NOTE: Chapter 13 allows 25–35% of gross income—$1,217.65 is 35% of gross income, plus $388 utilities) | $1,283 | $1,605.65 | $849 |
| Transportation | $254 | $ 240.00* | $160 |
| Living Expenses | $2,225 | $2,945.00** | $930 |

**19.** The court's determination that the Student Loan Obligation may be discharged does not mean that ECMC is not entitled to distributions as an unsecured creditor under the Modified Chapter 13 Plan.

\* Debtors do not own vehicle but pay for expenses as if they own it.

\*\* Food $405/couple, plus $150 for each preteen child, plus $175 for each teenage child = $1,655

 Clothing $50/person (10x$50 =$500)

MAXIMUM ALLOWED BY IRS &
CHAPTER 13 TRUSTEE GUIDELINES $3,762 $4,790.65

PLUS DEBTOR IS PAYING FOR THE FOLLOWING TWO EXPENSES:
Insurance not paid for by employer ($32 life; $38 auto) $70
Installment Payments ($100 refrigerator rental; $80 day-care co-pay) $180

TOTAL MONTHLY EXPENSES PAID BY DEBTOR $2,189***

## *EXHIBIT 2*

### CHAPTER 13 TRUSTEE GUIDELINES
### FOR MONTHLY EXPENSES

| | |
|---|---|
| 1. Rent or home mortgage payments (including lot payment for trailer) | Variable. Usually 25–35% of gross income. |
| 2. Utilities | Electricity $210, gas $73, water $55, telephone $50. |
| 3. Food | $260 for a single person, $405 for a couple, plus $150 for each preteenage child, $175 per teenage child. Amounts include food away from home such as school lunches. |
| 4. Clothing | $50 for each person. |
| 5. Laundry and cleaning | $15 per family member or $28 for a single person. |
| 6. Newspapers, periodicals and books (includes school books) | $25 per family. |
| 7. Medical and drug expenses | Determined on a case-by-case basis. Medical insurance is a factor. Usually no more than $50 with insurance and no special medical problems. |
| 8. Insurance (not paid for by employer) | Variable. Verification may be required. |
| 9. Transportation | Gasoline, oil, tires, tuneups, property taxes, tags, etc. $240 per vehicle. Bus fare per family if no vehicle, $75.<br><br>Vehicle lease or purchase payment, $400.00 per vehicle. |
| 10. Recreation | $45 per person. |
| 11. Club and union dues | Generally not allowed unless mandatory for job. |
| 12. Income taxes | If employed: Deductions should not exceed the IRS Form W–4 amount. If self-employed: Amount subject to verification. |
| 13. Alimony, maintenance or support | Variable; verification required. |

Laundry & Cleaning $15/family member (10 × $15 = $150)
Newspapers, magazines, books $25/family
Recreation $45/person (10 × $45 = $450)
Home maintenance $75 only if home is owned

Miscellaneous $90/family

*** Said figures are assumed to be acceptable to Trustee because they were included in the budget and no objection has been noted.

| | |
|---|---|
| 14. Other payments for support of dependents not living at home | Determined on a case-by-case basis. |
| 15. Religious contributions | Determined on a case-by-case basis. |
| 16. Home maintenance | $75, only if home is owned. |
| 17. Miscellaneous and contingency expenses | $90 per family. |